UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CUSTOM COMPOUNDING LLC
d/b/a PLYMOUTH MEDICAL, a
New York limited liability
company,

      Plaintiff,

v.                              Case No.:  2:26-cv-727-SPC-NPM

EMCYTE CORPORATION, a
Florida corporation,

       Defendant.

_____

## **OPINION AND ORDER**

Before the Court is Plaintiff Custom Compounding Medical LLC d/b/a Plymouth Medical's ("Plymouth Medical") Motion for Preliminary Injunction (Doc. 10) and supporting memorandum (Doc. 11). Defendant EmCyte Corporation ("EmCyte") responded in opposition. (Doc. 31). On March 31, 2026, the Court held a one-day evidentiary hearing on the motion and heard oral argument. (Docs. 43, 44). For the below reasons, the Court grants the motion in part.

## Background[1]

This case involves trade secret misappropriation.  EmCyte is a medical device manufacturer that develops, manufacturers, and distributes regenerative medicine products, such as platelet-rich plasma devices used in orthopedic treatments.  It sells its products directly to end customers and indirectly through distributors.  Plymouth Medical was one of EmCyte's distributors.  It would purchase EmCyte's product for a set price and then sell EmCyte's product to its own clients for a profit.  Roughly sixty-four percent of Plymouth Medical's sales came from selling EmCyte's product line.  The remaining thirty-six percent came from business and clients unrelated to EmCyte or its products.

For eleven years, Plymouth Medical and EmCyte maintained a business relationship.  They operated under a distribution agreement until it expired in 2022.  Despite the agreement's expiration, the parties continued to conduct business while they negotiated a new agreement.  They struggled to do so and, recently, their relationship became a bit shaky.  It all came to a head over the last couple months.  Hence, this lawsuit.

---

[1] The facts in this section are taken from the briefing and the hearing.  During the hearing, both parties elicited much testimony on matters not relevant to the issues at hand, namely trade secret misappropriation and civil conspiracy.  The Court addresses only the salient facts.

On the evening of March 9, 2026,[2] Arianne Pinacate—Plymouth Medical's contractor and virtual assistant—used her special system access to download Plymouth Medical's confidential master client list (among other alleged trade secret information), which included its clients' email addresses.[3] (*See* Pl. Ex. 23).  On March 10 at 1:00 a.m., Pinacate unexpectedly emailed Plymouth Medical's founder and CEO, Jo-An Tremblay, resigning effective immediately.  (Pl. Ex. 18).

Later that morning, around 10:30 a.m., EmCyte sent Plymouth Medical a Cease-and-Desist Notice, notifying Plymouth Medical that EmCyte was terminating their relationship and would "make no further sales of any of its Products to or on behalf of Plymouth Medical."  (Pl. Ex. 26).  In the notice, EmCyte demanded that Plymouth Medical return all EmCyte products and "cease all activity involving EmCyte's Products[.]"  (*Id.*).

Fast forward seven hours.  Around 5:30 p.m., an email blast went out to Plymouth Medical's clients containing an announcement from EmCyte.  The announcement proclaimed that "Plymouth Medical is no longer authorized to sell EmCyte's products or represent EmCyte Corporation in any manner"

---

[2] Unless otherwise indicated, all dates are from the year 2026.

[3] As part of her job duties, Pinacate maintained Plymouth Medical's client contacts and, thus, had access to its confidential and trade secret client list, including the clients' email addresses.  Although Pinacate is central to this dispute, neither party called her as a witness at the preliminary injunction hearing.

because "Plymouth Medical has violated EmCyte's policies, procedures, and regulatory mandates." (Pl. Ex. 4). It also advised that customers "are invited to purchase products directly from EmCyte," even promising "discounted rates for customers previously purchasing through Plymouth Medical." (*Id.*).

Not only did Plymouth Medical's clients that purchase EmCyte's products receive the email blast, but its independent customers that have no business affiliation with EmCyte or its products did as well. Indeed, the 3,501 email recipients were a 99.8 percent match to Plymouth Medical's confidential client list that Pinacate impermissibly downloaded the previous evening. The only variance from the client list was an additional seven email addresses, which incidentally belong to Plymouth Medical's direct competitors. Plymouth Medical received several inquiries from its clients confused about the email blast. (Pl. Ex. 15, 16, 42).

This undisputed timeline of events paints an ugly picture. Plymouth Medical believes Pinacate's improper download of the client list, her abrupt late-night resignation, the Cease-and-Desist, and the subsequent email solicitation to Plymouth Medical's client list—all within twenty-four hours—demonstrate that Pinacate and EmCyte conspired to misappropriate Plymouth Medical's trade secret client list to then steal its clients. It swiftly sued EmCyte, bringing a host of claims including trade secret misappropriation under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, and Florida

4

Uniform Trade Secret Act ("FUTSA"), Fla. Stat. §§ 668.001 *et seq.*, and civil conspiracy. (Doc. 9). It moved for a temporary restraining order and preliminary injunction on those claims. (Doc. 10). The Court granted the temporary restraining order (Doc. 14) and held an evidentiary hearing on the preliminary injunction (Doc. 43).[4]

At the hearing and in its response brief, EmCyte provided additional facts (albeit, disputed) to shed new light on the events. According to EmCyte's founder and CEO, Patrick Pennie, beginning in February 2026, he suspected Plymouth Medical of improper practices. So on March 6, he decided to terminate EmCyte's relationship with Plymouth Medical. But he did not disclose this decision immediately. He wanted to prepare an announcement to those customers that indirectly purchased EmCyte's products through Plymouth Medical, notifying them that they would no longer be able to purchase the products through Plymouth Medical.

Pennie and EmCyte's legal team prepared the announcement. And Pennie tasked his assistant, Marissa Guyan, with delivering it. He did not tell her how to do so; the ball was in Guyan's court.

---

[4] The Court entered the temporary restraining order on March 18, effective until April 1 at 3:00 p.m. (Doc. 14). After the preliminary injunction hearing, the Court extended the temporary restraining order's applicability, pursuant to Federal Rule of Civil Procedure 65(b)(2), until April 15 at 3:00 p.m. or until the Court entered an order on Plymouth Medical's motion, whichever occurred first. (Doc. 42). The parties then agreed to extend the temporary restraining order another week until April 22 at 3:00 p.m. (Docs. 51, 52).

Guyan needed a way to send the announcement to the thousands of EmCyte customers that purchased its product indirectly through Plymouth Medical. According to both Pennie and Guyan, EmCyte had the names and physical addresses of such customers in its internal database.[5] So Guyan *could have* sent the announcement by physical mail using EmCyte's internal information. Still, EmCyte's preference was to issue it expeditiously, so email was the best option. But EmCyte's database did not contain all the necessary email addresses. And the ones it possessed were not assigned to a specific client, meaning it would have been daunting to sift through the email library to match the available email addresses to the corresponding Plymouth Medical clients. So, Guyan sought the assistance of Pinacate, who Guyan considered her main point of contact at Plymouth Medical and her go-to for communications-related issues.

Guyan testified that on March 9, she reached out to Pinacate and explained that EmCyte planned to terminate the parties' distribution relationship and that it needed to notify customers accordingly. The two

---

[5] According to Pennie, whenever Plymouth Medical ordered an EmCyte product on a customer's behalf, it would include the customer's name and physical address on the purchase order. Sometimes the customer's email address was also provided. EmCyte recorded this information in its internal database. It also acquired email addresses (some of which were EmCyte customers that purchase through Plymouth Medical) through various marketing methods, such as attending and sponsoring conferences and purchasing leads. Thus, EmCyte had *some* email addresses associated with its indirect customers through Plymouth Medical.

agreed to use a Constant Contact account to issue the announcement.[6]  Guyan created the account and provided Pinacate with the username and password. The plan was for Guyan to upload the announcement, and then Pinacate would upload the relevant client email addresses—the ones who purchased EmCyte's product—and send it.

The following day, per their arrangement, Guyan uploaded the announcement to the account, and Pinacate uploaded the email addresses.  At that time, Guyan was unaware Pinacate had abruptly resigned only a few hours earlier.  Later that evening, Guyan received an email notification that the announcement had been sent.  Guyan maintains that she was unaware Pinacate would send the announcement to Plymouth Medical's independent customers, that the email addresses were confidential, or that Pinacate improperly acquired them.

EmCyte maintains that Pinacate never directly sent it the master client list, and EmCyte never acquired it.  Rather, its only access to the master client list was through the Constant Contact account, which Pinacate uploaded and then used to send the announcement.  Guyan testified she never subsequently downloaded or duplicated the contacts that Pinacate uploaded to the account. She also insists she never used that particular Constant Contact account

---

[6] Constant Contact is an email marketing platform used to send out text and email marketing campaigns.

again—although she acknowledged later logging into the account to identify the recipients that viewed the announcement.[7]

That said, Plymouth Medical's forensic analyst, Robert Rohr, conducted a review of the Constant Contact account and testified at the hearing. He observed that, on March 14, someone exported the email contacts in the account on two separate occasions. (Doc. 44 at 89–90). But he conceded he could not confirm (at least without a subpoena) where the contact information was downloaded. (*Id.* at 93). When asked about the March 14 contact export, Guyan testified that she received a notification indicating that someone from the Philippines accessed the account. Pinacate lives in the Philippines.

Rohr also discussed the obstacles he faced accessing the account. Simply entering the username and password (which EmCyte provided[8]) was not sufficient because the account required multifactor authentication. Completing the login process required entering a code texted to Guyan's

---

[7] A few days later, Guyan sent out another announcement (Pl. Ex. 7) using a different Constant Contact account. She and Pennie maintain the email list for this announcement was compiled using contact information from EmCyte's internal database. Guyan also subsequently sent physical packages to Plymouth Medical clients (Pl. Ex. 8), purportedly using information from EmCyte's internal database, not Plymouth Medical's confidential client list.

[8] EmCyte turned over the Constant Contact account credentials in compliance with the Court's temporary restraining order. (*See* Doc. 19). EmCyte also indicated in its Notice of Compliance that it does not otherwise have possession, custody, or control of Plymouth Medical's client list (or any other alleged trade secret). (*Id.*). Pennie and Guyan reaffirmed this point during the hearing.

cellphone. So Rohr had to coordinate with EmCyte's counsel to obtain the requisite code from Guyan so he could access the account.

## Analysis

There are three matters to address. Taking center stage is Plymouth Medical's request for a preliminary injunction. (Doc. 10). EmCyte also raises an unclean hands defense, which it believes precludes Plymouth Medical from receiving equitable relief. (Doc. 31). Last is Plymouth Medical's request for a forensic examination. (Doc. 10). The Court tackles each in turn.

### A.   Preliminary Injunction

Plymouth Medical seeks a preliminary injunction based on its trade secret misappropriation and civil conspiracy claims. A "preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). To obtain a preliminary injunction, Plymouth Medical "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894, 896 (11th Cir. 2024), *cert. denied sub nom. Grayson v. Hamm*, 145 S. Ct. 586 (2024) (quoting *Ramirez v. Collier*, 595 U.S. 411, 421 (2022) (internal quotation marks and citation omitted)).

As discussed below, Plymouth Medical has satisfied its burden as to its trade secret misappropriation claims.[9]  So a narrowly tailored preliminary injunction is appropriate to maintain the status quo.

### 1.    Irreparable Harm

The irreparable harm inquiry is a critical component of the preliminary injunction analysis and is considered the "sine qua non of injunctive relief." *N.E. Fla. Chapter of Ass'n of General Contractors v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).  "To satisfy this element, it is well settled that a plaintiff is required to show potential harm which cannot be redressed by a legal or equitable remedy following a trial and that the preliminary injunction is the only way of protecting the Plaintiffs from harm." *Pliteq, Inc. v. Mostafa*, 775 F. Supp. 3d 1231, 1255 (S.D. Fla. 2025) (citation and internal quotation marks omitted)).  Irreparable injury "must be neither remote nor speculative, but actual and imminent."  *SME Racks, Inc. v. Sistemas Mecanicos Para, Electronica, S.A.*, 243 F. App'x 502, 504 (11th Cir. 2007).

Plymouth Medical argues that if EmCyte is not enjoined from using its client list to solicit and conduct business with its customers, it will be irreparably harmed by the loss of customers and business.  Generally, "the loss

---

[9] As such, the Court need not address the civil conspiracy claim.  *See Sapphire Consulting Servs. LLC v. Anderson*, No. 6:20-CV-1724-CEM-LRH, 2021 WL 1053276, at *3 (M.D. Fla. Feb. 12, 2021) ("When a plaintiff asserts multiple claims as a basis for a preliminary injunction, the plaintiff need only establish a substantial likelihood of success on one claim." (citation and quotation marks omitted)).

of customers and goodwill is an 'irreparable' injury." *All Leisure Holidays Ltd. v. Novello*, No. 12-62328-CIV, 2012 WL 5932364, at \*5 (S.D. Fla. Nov. 27, 2012) (cleaned up) (collecting cases). The Court agrees, in part, that Plymouth Medical would be irreparably harmed without an injunction.

Plymouth Medical categorized its client base into two buckets: (1) those that purchase EmCyte products, and (2) independent clients that have no affiliation with EmCyte or its products. As it pertains to the former, the Court fails to see how EmCyte soliciting and conducting business with such clients harms Plymouth Medical. EmCyte sent Plymouth Medical a cease-and-desist notice precluding it from further selling EmCyte's products. Given the parties all agree they were not bound by any contract, EmCyte appears within its rights to do so. Without the ability to sell EmCyte products, it seems Plymouth Medical would lose its EmCyte clients anyway. So enjoining EmCyte from soliciting or engaging in direct business with its customers that purchased through Plymouth Medical would do nothing to help Plymouth Medical salvage them.

That said, Plymouth Medical would be irreparably harmed if EmCyte is not enjoined from conducting new business with Plymouth Medical's independent clients. The record demonstrates EmCyte has tried soliciting Plymouth Medical's independent clients on multiple instances. And EmCyte admitted that it began conducting business with Plymouth Medical's clients

after EmCyte sent the announcement.  (Pl. Ex. 14).  As noted above, the loss of customers generally constitutes an irreparable injury.  But it is especially harmful here.  Plymouth Medical's clients that purchase EmCyte products accounts for sixty-four percent of its business.  With that business now lost, Plymouth Medical must rely on its independent clients (the remaining thirty-six percent of its business) to stay solvent.  Indeed, Tremblay testified that without an injunction, Plymouth Medical will likely have to shut down.  (Doc. 44 at 60:9–13).

EmCyte argues Plymouth Medical cannot show prospective harm because it no longer has access to the client list (having turned over the credentials to the Constant Contact account), and it has no other copy of the client list.  (Doc. 31 at 13–15).  But with the horse already out of the barn, closing the barn door does nothing to rectify the problem.  Given EmCyte already used the client list to solicit Plymouth Medical's clients, its inability to use the client list *further* does not alleviate any concerns.  At any moment, customers could abandon their relationship with Plymouth Medical in response to the solicitation.  This potential loss of business is a very real risk of prospective harm.  To hold otherwise would permit EmCyte to reap the benefit of new business generated from the alleged improper solicitation simply because it issued the solicitation before getting caught.  So as it pertains

to its independent clients, Plymouth Medical has shown that it will be irreparably harmed without an injunction.

### 2.    Likelihood of Success on the Merits

"A substantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain, success." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005). Plymouth Medical claims EmCyte misappropriated its trade secrets in violation of the DTSA and the FUTSA.[10] (Doc. 9). To succeed on a claim under the DTSA, a plaintiff must show: (1) it owned a trade secret, (2) the defendant misappropriated the plaintiff's trade secret, and (3) the misappropriated trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.[11] *La Potencia, LLC v. Chandler*, 733 F. Supp. 3d 1238, 1269 (S.D. Fla. 2024) (citations omitted).

Misappropriation occurs when a trade secret is acquired by someone who knows or has reason to know that the secret was obtained by improper means.

---

[10] Because the FUTSA and DTSA are largely the same, the Court analyzes both claims together. *See Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1311 n.13 (11th Cir. 2020) (conducting the analysis of an FUTSA and DTSA claim together); *Freedom Med., Inc. v. Sewpersaud*, 469 F. Supp. 3d 1269, 1275 n.6 (M.D. Fla. 2020) ("DTSA and FUTSA can be analyzed together.").

[11] For purposes of this Order, EmCyte does not dispute Plymouth Medical's client list constitutes a trade secret. (Doc. 31 at 15–16). And it is undisputed Plymouth Medical's trade secret satisfies the interstate commerce element.

13

18 U.S.C. § 1839(5)(A).  It can also occur when a trade secret is disclosed or used, without express or implied consent, by a person who:

    (i)     used improper means to acquire knowledge of the trade secret; [or]

    (ii)    at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was:

        I.  derived from or through a person who had used improper means to acquire the trade secret;

        II.  acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

        III.  derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret[.]

*Id.* at § 1839(5)(B)(i)–(ii).  The term "improper means" includes theft, bribery, breach of a duty to maintain secrecy, and inducement of a breach to maintain secrecy.  *Id.* at § 1839(6).  Although not particularly developed in its motion, Plymouth Medical's amended complaint appears to invoke each section (and its Florida counterpart).  (Doc. 9 ¶¶ 82, 92–93).

    The trade secret at issue here is Plymouth Medical's confidential master client list, which contains the clients' email addresses.[12]  To establish EmCyte misappropriated its confidential client list, Plymouth Medical relies largely on circumstantial evidence—mainly the suspicious timeline of events.  And

---

[12] Plymouth Medical's amended complaint identifies a host of other trade secret information EmCyte allegedly misappropriated. (Doc. 9 ¶ 19).  But EmCyte certified that Pinacate never provided it with the other trade secret information, nor does it possess or have access to it. (Docs. 19, 19-1).  Plymouth Medical produced no evidence (direct or circumstantial) to the contrary.  So the Court disregards these other trade secrets and focuses solely on the master client list.

unquestionably, the timeline is problematic. Pinacate improperly downloaded Plymouth Medical's trade secret client list then abruptly resigned in the dead of the night. Nine hours later, EmCyte sent its cease-and-desist letter to Plymouth Medical. A few hours later, EmCyte's announcement and solicitation was sent to Plymouth Medical's entire client list. These facts are undisputed. In Plymouth Medical's view, the timing and scope of the events suggest Pinacate smuggled Plymouth Medical's confidential client list to EmCyte, and EmCyte used the list to solicit Plymouth Medical's clients.

But EmCyte offered additional context which, at first blush, casts doubt on Plymouth Medical's theory. According to the testimony, Guyan requested the client email address from Pinacate because EmCyte's database did not have the requisite information. Pinacate—a Plymouth Medical representative—not only agreed to provide the information but also uploaded and used it. Guyan maintains she did not know the requested information was confidential. These facts, if true, would likely exonerate EmCyte.

Standing alone, EmCyte's story appears plausible. And given the competing theories turn on various factual disputes (mainly surrounding Pinacate), it would stand to reason that Plymouth Medical has not clearly established a substantial likelihood of success on its trade secret misappropriation claims. *See Castellano Cosm. Surgery*, 2021 WL 3188432, at *4 ("Highly disputed factual issues may cast doubt on the plaintiff's substantial

likelihood of success.").  But upon closer review, EmCyte's explanation does not hold water.

There are several holes in EmCyte's account.  To begin, Guyan claims she provided Pinacate the Constant Contact credentials on March 9, and then Pinacate uploaded the client email addresses the following day.  But the record indicates the Constant Contact account was protected by a multifactor authorization linked to Guyan's phone.  So, like Rohr during his forensic examination of the account, Pinacate would not have been able to access the account on March 10 with just the username and password alone; she would have needed Guyan's help to clear the multifactor authorization.  But Guyan testified she never spoke with Pinacate after March 9.  (Doc. 44 at 198:6–15).  So how Pinacate accessed the Constant Contact account on March 10 remains unclear.  This is problematic because if Pinacate did not access the Constant Contact account on March 10, then it must have been Guyan (or someone from EmCyte) who uploaded the confidential client email addresses.

When questioned on this point, Guyan simply responded that she probably added the multifactor authentication after March 10 (but before March 24 when Rohr accessed it).  (Doc. 44 at 218:14–15).  The Court is skeptical of this response.  Guyan testified that she created this particular account for the one-time use, and she never used the account again.  If the

account served no further purpose after March 10, what reason would there be to subsequently add increased security measures?

Another problem. Plymouth Medical introduced evidence demonstrating that someone twice tried to export the email addresses in the Constant Contact account on March 14. Only Guyan and Pinacate had the login credentials to do so. Guyan tried explaining this away by stating she received a notification that someone in the Philippines (where Pinacate resides) accessed the account, implying it was Pinacate who requested the contact export. But EmCyte produced no evidence of this notification. And it makes no sense that Pinacate would download the contacts from the account because everyone agrees she had already downloaded it straight from Plymouth Medical's database on March 9. If she already had the client list, why would she need to download it again? And for the same reason previously mentioned, it is unclear how Pinacate would have cleared the multifactor authorization to access the account without Guyan's assistance.

Something else does not add up. There is no dispute Pinacate resigned on March 10 at 1:00 a.m. effective immediately—which is strange enough in and of itself. But given her abrupt and immediate resignation, why would Pinacate subsequently continue to aid EmCyte's efforts to issue the announcement in her capacity as a Plymouth Medical employee? And not just upload the entire confidential client list but also go out of her way to add seven

17

additional email addresses of Plymouth Medical's direct competitors. It makes little sense.

Perhaps most problematic for EmCyte is the lack of testimony from Pinacate. Pinacate is the lynchpin of EmCyte's defense. And Guyan testified she can communicate with Pinacate. (Doc. 44 at 221:21–24, 222:5–16). Yet EmCyte did not produce Pinacate as a witness at the hearing, nor did it provide a sworn declaration. While it is perhaps understandable that Pinacate would not willingly affirm EmCyte's story (potentially implicating herself for trade secret misappropriation), her testimony is critical to EmCyte's defense. Given the various holes in EmCyte's story, its defense lacks credibility without her testimony.

EmCyte's argument that it was unaware the client list was confidential also rings hallow. Tremblay testified that EmCyte had previously requested Plymouth Medical's client email information. (Doc. 44 at 22:8–15, 23:15–24). Back in September 2025, EmCyte sought as a condition of a new distribution agreement the ability to directly communication with its customers purchasing through Plymouth Medical. Plymouth Medical balked at that. (Pl. Ex. 21). And this was a sticking point to the negotiation. So, presumably, EmCyte should have known Plymouth Medical closely guarded its client list.

EmCyte also suggests it had Plymouth Medical's consent to use its client list because Pinacate agreed to provide the information. This position also falls

18

flat.  The Court need not look further than the announcement itself, which declared that "Plymouth Medical has violated EmCyte's policies, procedures, and regulatory mandates."  (Pl. Ex. 4).  It is difficult to believe Plymouth Medical would willingly aid EmCyte with issuing a notice to its customers that accuses it of such improper (and perhaps illicit) conduct.  And on that score, it is puzzling that, on March 9, EmCyte asked Plymouth Medical to help announce the termination of their relationship given EmCyte did not notify Plymouth Medical of the termination until the following day.[13]

And regarding the termination, it is suspect that Pennie, after an eleven-year business relationship with Tremblay, did not personally speak with her about his suspicions of wrongdoing and terminate their relationship himself. Instead, he removed himself from the situation, leaving Guyan to determine the who, what, when, where, and why of the procedure to do so.

One more point.  EmCyte maintains its internal database already contained the names and physical addresses of the EmCyte customers who purchased through Plymouth Medical.  But it is Plymouth Medical's *independent* clients and their *email addresses* that are of concern.  *Cf. Castellano Cosm. Surgery*, 2021 WL 3188432, at *6 (rejecting argument that

---

[13] Another important point.  Most cases involving misappropriated confidential client lists involve an employee impermissibly downloading the information and then bringing it to a competitor.  Accepting EmCyte's argument would permit a company to avoid a preliminary injunction by claiming it had consent from the very person it conspired with to misappropriate a client list.  The Court declines to set such a standard.

19

some customer information was publicly available through online reviews, such as clients' names, because the defendant "did not present evidence that most client *email addresses* were publicly available" (emphasis added)). Although EmCyte claims it already had *some* of the pertinent email addresses, it acknowledged that they were not compiled in one easily accessible electronic location, like Plymouth Medical's client list. Indeed, the fact EmCyte did not have all the requisite email addresses readily available is purportedly the very reason Guyan reached out to Pinacate in the first place. And it is precisely what makes Plymouth Medical's client list valuable. *Cf. id.* ("[T]he fact that some of the information contained within the client email list may be available through other means does not discount that the compilation of that data was reasonably kept secret."); *Sexual MD Sols., LLC v. Wolff*, No. 20-20824-CIV, 2020 WL 2197868, at *14 (S.D. Fla. May 6, 2020) (explaining even if the bases for the information is available elsewhere, it is the "unique compilation of that information specifically tailored to a particular market" that renders the information trade secret). And above all else, EmCyte provided no evidence that it previously possessed any of these emails. So this point is equally unmoving.

In sum, there is no question that, at this stage, Plymouth Medical's case is based largely on circumstantial evidence. But "direct evidence of misappropriation is difficult to prove in trade secret cases and [a trade secret

20

misappropriation claim] can be based on circumstantial evidence." *Mapei Corp. v. J.M. Field Mktg., Inc*, 295 So. 3d 1193, 1199 (Fla. Dist. Ct. App. 2020) (citing *Stratienko v. Cordis Corp.*, 429 F.3d 592, 600–01 (6th Cir. 2005)); *see also Crystal Lagoons U.S. Corp. v. Oasis Amenities, LLC*, No. 8:23-CV-519-TPB-AEP, 2025 WL 2263863, at *7 (M.D. Fla. Aug. 7, 2025) (finding circumstantial evidence of trade secret misappropriation sufficient to support preliminary injunction). Considering EmCyte's defense falls apart under scrutiny, and the clear red flags surrounding the timeline of the undisputed events, Plymouth Medical has established a substantial likelihood of success on the merits for its trade secret misappropriation claims.

### 3.    Balance of Equities

The balance of equities weighs heavily in Plymouth Medical's favor. As discussed, Plymouth Medical could lose what little remains of its business if EmCyte is permitted to generate new business from the solicitation at Plymouth Medical's expense. Conversely, the injunction causes EmCyte no harm. By its own admission, EmCyte never intended for Plymouth Medical's independent clients to receive the initial email announcement and solicitation. So it should have no problem forgoing any business with such clients until this lawsuit is resolved.

### 4.   Public Interest

"Courts have routinely held that the public interest is served by the protection of trade secrets[.]" *Anchor Title & Escrow, LLC v. Omega Nat'l Title Agency, LLC*, No. 3:23CV8043-TKW-HTC, 2023 WL 3564942, at *3 (N.D. Fla. Apr. 14, 2023) (cleaned up and collecting cases).  Likewise, the Court finds that a preliminary injunction is in the public interest here.

## B.   Unclean Hands

EmCyte argues Plymouth Medical is barred from receiving the benefit of an injunction because it has unclean hands.  "To assert an unclean hands defense, a defendant must show that (1) the plaintiff's wrongdoing is directly related to the claim, and (2) the defendant was personally injured by the wrongdoing." *Bailey v. TitleMax of Ga., Inc.*, 776 F.3d 797, 801 (11th Cir. 2015).

EmCyte maintains Plymouth Medical's hands are not clean because it disclosed EmCyte's confidential information.  When Plymouth Medical filed this action, it attached an unredacted copy of the confidential Distribution Agreement to the complaint.[14]  In doing so, Plymouth Medical publicly disclosed EmCyte's confidential tiered pricing with Plymouth Medical.  Making

---

[14] Given the alleged confidential nature of the document, the Court does not cite the docket entries.  That said, the parties have agreed to replace the relevant exhibits with redacted versions.  (Doc. 37).

22

matters worse, Plymouth Medical then issued an announcement to its clients regarding this lawsuit with a link to the complaint—including the attached distribution agreement.

The distribution agreement contains a confidentiality and non-disclosure requirement. Section 8 states that all information provided by EmCyte to Plymouth Medical, including trade secrets, is confidential business information and must be held in strict confidence. EmCyte believes Plymouth Medical's public disclosure of confidential information within the agreement violated section 8.

Although the distribution agreement expired in 2022, EmCyte asserts Plymouth Medical is nonetheless bound to maintain confidentiality because section 8 provides that the parties' "obligations and duties under this Section 8 shall survive the termination of this Agreement for a period of five (5) years." This provision would extend section 8's applicability through 2027.

The Court rejects EmCyte's unclean hands argument at this stage. Its argument rests on an interpretation of the expired distribution agreement (specifically, section 8) that the parties hardly develop. And the Court is not convinced EmCyte provides an accurate interpretation of section 8's survival clause. Without further argument on this point, the Court cannot properly determine the parties' obligations or whether Plymouth Medical breached any such obligation. EmCyte's unclean hands defense fails.

23

## C.    Forensic Examination

In its motion, Plymouth Medical summarily asks the Court to order EmCyte to "make available for forensic imaging all electronic devices—including computers, servers, and mobile phones—that potentially contain Plymouth Medical's [trade secret information], consistent with the relief granted in similar cases." (Doc. 11 at 24).  However, other than a citation to a single case, it provides no argument or support suggesting entitlement to such intrusive discovery.  Plymouth Medical is free to file a motion to compel for such relief.  The Court will address the issue at that time.

Accordingly, it is

**ORDERED:**

1. Plymouth Medical's Motion for Preliminary Injunction (Doc. 10) is **GRANTED in part**.

2. The Court hereby **ENJOINS and RESTRAINS** EmCyte and all persons acting in concert with EmCyte from:

   a. Using, disclosing, disseminating, or otherwise exploiting Plymouth Medical's Confidential Master Client List in any way;

   b. Further contacting, soliciting, or communicating with any Plymouth Medical client *apart from those that purchased EmCyte's products indirectly through Plymouth Medical*;

c. Conducting business with any person or entity that, on March 10, 2026, was an existing Plymouth Medical client or customer *apart from those that purchased EmCyte's products indirectly through Plymouth Medical,* except to the extent that EmCyte or its affiliates were already conducting business with such client prior to March 10, 2026; and

d. Destroying, altering, or concealing any evidence related to the acquisition, misappropriation, or use of the Master Client List.

3. Except to the extent outlined herein, the temporary restraining order (Doc. 14) is dissolved.

**DONE** and **ORDERED** in Fort Myers, Florida on April 22, 2026.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: All Parties of Record

25